AO 106 (Rev. 04/10) Application for a Search Warrant

Authorized and Approved Date: s/Nick Coffey 2/15/24

# UNITED STATES DISTRICT COURT
## for the
### Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| THE CELLULAR DEVICE ASSIGNED CALL NUMBER (956) 929-7458 | ) |
| WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / | ) |
| ELECTRONIC SERIAL NUMBER 3101150919272895 IN THE | ) |
| CUSTODY OR CONTROL OF AT&T | ) |

Case No. M-24- 151 -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Distribution and Possession of CS with Intent to Distribute; Drug Conspiracy |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Adams, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Feb 15, 2024**

_____
*Judge's signature*

City and state: Oklahoma City, Oklahoma

SHON T. ERWIN, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (956) 929-7458 WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER 310150919272895 IN THE CUSTODY OR CONTROL OF AT&T** | **Case No.**  MJ-24-151-STE <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **Michael Adams**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned with call number **(956) 929-7458** (the "**Subject Account**") that is in the custody or control of AT&T, a wireless communications service provider that accepts process at 11760 U.S. Highway 1 North Palm Beach, Florida 33408.  As a provider of wireless communications service, **AT&T** is a provider of "electronic communications service," as defined in 18 U.S.C. § 2510(15).

2.     The information to be searched is described in the following paragraphs and in **Attachment A**.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require **AT&T** to disclose to the government the information further described in Section I of **Attachment B**.  Upon receipt of the information described in Section I of **Attachment B**,

government-authorized persons will review the information to locate the items described in Section II of **Attachment B**.

3.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definition of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127.   The requested warrant therefore includes all the information required to be included in an order pursuant to that statute, including a certification from an attorney for the government that the information likely to be obtained by the requested pen register and trap-and-trace device is relevant to an ongoing criminal investigation. *See* 18 U.S.C. § 3123(b)(1). That certification is attached as **Attachment C**.

4.    In sum, this affidavit is made in support of an application for three distinct items: (1) a pen register and trap-and-trace device on the **Subject Account**, pursuant to 18 U.S.C. § 3121–3127; (2) a "ping" on the **Subject Account**, pursuant to 18 U.S.C. § 2703 and Fed. R. Crim. P. 41(c); and (3) an order for prospective cell site data for the **Subject Account**, pursuant to 18 U.S.C. § 2703(d).

5.    I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been a Special Agent with the Federal Bureau of Investigation (FBI) (the "**Investigating Agency**") since March 2015.  As a Special Agent, I have participated in and conducted investigations involving violations of federal criminal laws to include the

distribution of and conspiracy to distribute controlled substances. I am familiar with the investigative techniques used in these investigations such as the use of undercover agents, the use of cooperating source(s), the analysis of telephone tolls and pen register information, search and seizure warrants, Grand Jury investigations, and the interception of wire and electronic communication. In this capacity, my responsibilities include the investigation of possible violations of federal law. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 (the "**Target Offense(s)**") have been committed by Cesar Azamar Aguilar (**CESAR**) and other known and unknown co-conspirators. There is also probable cause to search the information described in **Attachment A** to assist and aid in the location of **CESAR** as further described in **Attachment B**.

8.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. §§ 2711 & 3127. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. §§ 2711(3)(A)(i) & 3127(2)(A)(i).

## PROBABLE CAUSE

9.      Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond.  During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine (meth).  These IMG members and their associates were ultimately indicted and convicted.  See United States v. Velasquez, CR-18-260-SLP.  Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network.  During that portion of the investigation ("Phase 1") investigators uncovered a massive meth distribution network led by Hernandez.

10.      Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of meth to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction.  Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan".  Law enforcement also found evidence indicating "Mamisan" was the individual responsible for

coordinating the shipments of liquid meth from the U.S.-Mexico border to Oklahoma; the investigation established that the meth was being transported in the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

11.    As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, *and United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential

human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein.

12.     Since phase two of the investigation launched, law enforcement has identified the same organization, albeit with some new players, continuing to function using virtually the same modus operandi.

13.     For example, law enforcement first identified 701 SE 29th Street, Oklahoma City, Oklahoma (the "29th St. warehouse") in May 2023 as one of the private locations used by the DTO for receiving shipments of liquid meth from semi-trucks. On May 10, 2023, a black 2015 Cascadia Freightliner bearing Texas tag R65-9752 (the "black semi-truck"), with no trailer attached, arrived to the 29th St. warehouse and pulled into one of the garage bay doors and the door closed behind it. The truck stayed for approximately ten minutes. Based off of the previous multi-year investigation, law enforcement suspected the black semi-truck had delivered meth. Additional investigation into the black semi-

---

[1]     CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

truck further convinced investigators of this: the black semi-truck was issued to Dare Express LLC at 1111 Champion Drive, Donna, Texas. According to the Texas Office of the Comptroller, Dare Express LLC's registered Agent is Denis Gutierrez (Denis) and has a registered office address of 6514 E Texas Rd., Edinburg, Texas (the "Edinburg location"). Denis, along with Nelly who is believed to be Denis' wife, was a signatory on a Chase bank account associated to DGC Express LLC—the same company operating the semi-trucks delivering liquid meth to Oklahoma City in 2021 as described previously.

14.    Following this apparent delivery on May 10, 2023, law enforcement saw the black-semi truck return to the 29th St. warehouse on May 21, 2023, June 7, 2023, July 7, 2023, and July 11, 2023. Each time, the truck stayed for a short amount of time, suggesting to investigators that these too were deliveries of liquid meth. On September 21, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the 29th St. warehouse, and the second authorizing the monitoring and recording of visual, non-verbal conduct inside the warehouse. Law enforcement monitored activity inside the 29th St. warehouse for a total of 87 days.[2] During that time, law enforcement was able to

---

[2]    Law enforcement received two additional bug and/or CCTV authorizations for the 29th St. warehouse after this initial round. First, on October 20, 2023, United States District Judge Scott L. Palk authorized the continued monitoring and recording of visual, non-verbal conduct inside the warehouse. Then, on November 17, 2023, United States District Judge Jodi W. Dishman authorized the renewed interception of oral communications and the continued monitoring and recording of visual, non-verbal conduct inside the same location.

observe three deliveries in real time as they occurred on November 10, November 17, and December 6.

15.     On all three occasions, the black semi-truck pulled into the large middle garage bay of the 29th St. warehouse.  Once inside, two individuals—Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua)—extracted the liquid meth from inside the passenger side fuel tank of the black semi-truck into a large IBC tank housed inside of a black, pull-behind trailer.  DTO members later transported the black, pull-behind trailer with the meth to the DTO's clandestine conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma (Wellston lab).  At the time, law enforcement believed that the Wellston lab, a rural, five-acre property with both a residence and a detached garage, was serving as the DTO's principal conversion lab.

16.     Two days after the December 6 delivery at the 29th St. warehouse, law enforcement executed a search warrant at the Wellston lab, confirming it was, as suspected, a methamphetamine conversion lab.  Law enforcement found a fully functioning meth conversion lab, recovered more than 1000 lbs. of liquid and crystal meth[3], and arrested both Rodriguez and Equihua on site.

17.     Physical surveillance on the black semi-truck has also led investigators to discover where the black semi-truck has been stored and where it receives liquid methamphetamine before it travels to Oklahoma.  In August 2023, law enforcement

---

[3]     Field tests resulted in presumptive positives, but official results from the DEA lab in Dallas, Texas are still pending.

observed the black semi-truck travel to 1316 Eldora Rd., Alamo, Texas (the "Alamo location"). Regular surveillance on the Alamo location in response established that the black semi-truck was being stored at the Alamo location, rather than at the Subject Property, where Denis stores the other semi-trucks in Dare Express's fleet. And as the property where the black semi-truck is loaded with liquid meth before it makes its trips to Oklahoma. It appears that a truck from Mexico will cross into the United States from Mexico, arrive at the Alamo location, and transfer its liquid meth to the black semi-truck. It thus appeared that Denis was keeping the black semi-truck that he used for drug distribution at the Alamo location and his "clean" trucks at the Edinburg location.

18.     This is consistent with what a cooperating defendant (CD1)[4] has told law enforcement. CD1 told law enforcement that Denis was in charge of the Alamo location and that Mexican semi-trucks would deliver liquid meth to this location. CD1 identified a photo of **CESAR** as the individual responsible for unloading the liquid meth from the Mexican semi-trucks at the Alamo location. CD1 also said the DTO stored the liquid meth

---

[4]     CD1 began cooperating with law enforcement in 2023. Prior to this he had been arrested for drug crimes. CD1 has furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending drug charges. CD1 has not received any monetary compensation to date for his/her cooperation. The information provided by CD1 has been corroborated through other investigative techniques including, physical surveillance, telephone analysis, etc. Information provided by CD1 has been reliable, and I am unaware of any knowingly false information furnished by CD1. Information herein attributed to CD1, unless otherwise noted, was obtained by CD1 through his/her personal observations or conversations with targets of this investigation and their associates.

at this location in IBC tanks, before members of the DTO, including **CESAR**, transferred the liquid meth to domestic semi-trucks that would deliver to Oklahoma City or Georgia. CD1 also indicated that Denis was in charge of directing truck drivers when to pick up meth loads and where to deliver them. According to CD1, Denis communicated these instructions using an encrypted communication app called Silent Phone.[5] Lastly, CD1 indicated **CESAR**, when coordinating the meth transfers, would communicate with the Mexican truck drivers and the domestic truck drivers using different phones, one of which was the **Subject Account**.

19.     On October 5, 2023, law enforcement observed activity at the Alamo location corroborating CD1's statements.  On this date, Denis, **CESAR**, and others appeared to retrieve property from the steel building at the Alamo location.[6]  One of the items retrieved appeared to be an IBC tank, similar to the ones law enforcement has observed the DTO

---

[5]     Silent Phone is a subscription based, encrypted communication application. Silent phone, unlike some other encrypted applications, can delete the application's data, including stored conversations over Silent Phone, even when the device is in airplane mode or not connected to the internet.

[6]     On October 5, 2023, a Hidalgo County sheriff deputy was dispatched to the Alamo location in reference to a landlord dispute.  Upon his arrival, the Deputy spoke with Leticia Salazar (Salazar), the landlord of the property.  Salazar claimed she had rented the property to a "Daniel Gutierrez" since 2011.  Recently, "Daniel" had been late on rent payments, so Salazar cut the electricity to the property.  On this date, Salazar noticed that the garage doors to the steel building were missing, as well as the majority of "Daniel's" property. Salazar explained she contacted "Daniel" regarding the garage doors and Daniel confirmed that he took them.  Salazar provided the deputy a phone number for "Daniel" as (956) 270-3155, which law enforcement knows to be Denis' number.  In short, it appears that a dispute with his landlord drove Denis to move the black semi-truck to the Subject Property.  The DTO

using to store/transport liquid meth. This particular IBC tank was loaded into a white, fifty-three-foot trailer and transported to the Edinburg location—where it appears to have remained. Since October 5, 2023, law enforcement has not observed any semi-truck, including the black semi-truck, at the Alamo location. Rather, it appears that Dare Express has begun storing the black semi-truck, when it was not on the road, at the Edinburg location with other trucks in Dare Express's fleet.

20.     Given that the black-semi truck is now being stored at the Edinburg location, it has become a significant location for the DTO. For example, on November 9, 2023, Michael Estrada (Estrada)—a truck driver for the DTO—picked up the black semi-truck from the Edinburg location before traveling to Oklahoma City to deliver meth at the 29th St. warehouse on November 10, which law enforcement recorded via court-authorized CCTV.

21.     The next delivery to Oklahoma City did not occur until November 17, 2023. Two days prior to this, law enforcement observed **CESAR** coordinating what I believe was the transfer of the liquid meth from the Mexican truck to the black semi-truck at the Edinburg location. On that day, November 15, 2023, at 6:24 p.m., a white, semi-truck with no attached trailer arrived at the Edinburg location and pulled behind a structure where it was out of sight. As the white, semi-truck was arriving, **CESAR**, who had been waiting at the business, appeared to walk behind the structure where the white semi-truck disappeared. At 7:09 p.m., **CESAR** on foot, and the black semi-truck emerged from behind the structure. The black semi-truck then reversed into a parking space at the business. **CESAR** and the driver of the black semi-truck then walked towards the white semi-truck.

At 7:16 p.m., the white, semi-truck and a black Chevrolet pickup (which **CESAR** arrived in earlier that day) departed. Based on my training, experience, and knowledge of the investigation, I believe that **CESAR** was facilitating the transfer of liquid meth from the white semi-truck to the black semi-truck. Further convincing me of this is that the following day, November 16, 2023, Estrada (the truck driver for the deliveries to the 29th St. warehouse described above) flew from Chicago, Illinois, to McAllen, Texas, where he retrieved the black semi-truck. Estrada, driving the black semi-truck, then arrived in Oklahoma on the following day and made a delivery of liquid meth to the 29th St. warehouse, which was again recorded via CCTV.

22.    Based on surveillance at the Edinburg location and the ensuing events, I also believe there were transfers of liquid meth from the Mexican semi-truck to the black semi-truck on December 3, 2023, and December 13, 2023—both of which **CESAR** appeared to facilitate. The December 3 transfer of course preceded Estrada's delivery of liquid meth to the 29th St. warehouse on December 6, 2023. As for the December 13 transfer, that appears to have preceded Estrada's delivery to Oklahoma City on December 17, 2023. While this delivery did not occur at the 29th St. warehouse (and thus, was not recorded via CCTV and/or bug), GPS ping data on Estrada and Ray David Lara (Lara), a distributor for the DTO, suggested the two met at a rural location about 45 minutes southeast of Oklahoma City, near Tecumseh, Oklahoma. Given that I am aware of no other reason for Estrada, driving the black semi-truck, to meet with Lara apart from making a delivery of liquid meth, I believe this too was a delivery, potentially at a new drop point for the DTO.

23.    In conclusion, as CD1 indicated, **CESAR** appears to be central to the DTO's

operation, specifically, the transfer of liquid meth in south Texas. The investigation into the DTO and **CESAR** is ongoing, and location information on the **Subject Account** will undoubtedly aid law enforcement in confirming new locations and associates related to the DTO, including a potentially new transfer location given the DTO previously used the Alamo location to separate their criminal activity from the semi-legitimate Edinburg location.

24.    Through administrative subpoenas, I have confirmed that AT&T continues to provide service for the **Subject Account**, for which "Cesar Aguilar" is listed under "User Information" for the **Subject Account**.

25.    In my training and experience, I have learned that AT&T is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

26.    Based on my training and experience, I know that AT&T can collect cell-site data about the **Subject Account**. Based on my training and experience, I know that for

each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; (5) the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data; and (6) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

27.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

28.    Based on my training and experience, I know wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may assist in locating **CESAR**.  In my training and experience, this information may also constitute evidence of the crimes under investigation because the information can be used to identify the **Subject Account**'s user or users and may assist in the identification of co-conspirators.

29.    Based on my training and experience, the combination of both historical and prospective location information is helpful in locating individuals.  The historical location information from cellular phones can help establish a pattern of life, while prospective location information—including cell-site information, phone pings, and timing advance measurements/distance-to-tower measurements—can help provide more precise real-time information regarding the location of the **Subject Account's** user.  To help ensure that **CESAR** is located to assist in surveillance operations furthering the investigation into **CESAR**, I am requesting precise location information for the next forty-five (45) days for the **Subject Account**.

## AUTHORIZATION REQUEST

30.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.  The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in **Attachment A** for each communication to or from the **Subject Account**, without geographic limit, for a period of forty-five (45) days pursuant to 18 U.S.C. § 3123(c)(1).

31.     I further request, pursuant to 18 U.S.C. § 2703(b)(1)(A), that the Court find that the government is not required to provide notice of this warrant to the subscriber, customer, or person who was monitored.  I also request, pursuant to 18 U.S.C. § 3123(d), that AT&T be ordered not to disclose to the listed customer or any other person the existence and/or use of the pen register and trap-and-trace device sought herein. Additionally, there is reasonable cause to believe that providing immediate notification of the warrant to the subscriber, customer, or person who is being monitored may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber, customer, or user of the **Subject Account** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 2705(a)(2).  Therefore, I request that the Court order AT&T not to notify any other person of the existence of this warrant and order for a period of one year from the date the requested warrant is issued, except that the service provider may

disclose this warrant and order to an attorney for the service provider for the purpose of receiving legal advice. As further specified in **Attachment B**, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32.    I further request that the Court direct AT&T to disclose to the government any information described in Section I of **Attachment B** that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

33.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for a period of one year from the date the requested warrant is issued, or until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents as their premature disclosure may jeopardize this investigation.

Respectfully submitted,

MICHAEL ADAMS
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on Feb. 15, 2024

SHON T. ERWIN
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1.  The cellular telephone assigned call number (956) 929-7458 with International Mobile Subscriber Identity / Electronic Serial Number 310150919272895 (the "**Subject Account**") whose wireless service provider is AT&T (the "Provider"), a company that accepts process at 11760 U.S. Highway 1 North Palm Beach, Florida 33408.

2.  Records and information associated with the **Subject Account** that is within the possession, custody, or control of the Provider.

## ATTACHMENT B

### Particular Things to Be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **Subject Account** listed in **Attachment A**:

a.      The following information about the customers or subscribers associated with the **Subject Account** for the time period May 1, 2023, to the present:

       i.      Names (including subscriber names, user names, and screen names);

      ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.      Local and long-distance telephone connection records;

    iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

     v.      Length of service (including start date) and types of service utilized;

    vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records;

ix.     All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Subject Account**, including:

    1.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    2.    inform information regarding the cell tower and antenna face (also known as "sectors" through which the communication were sent and received.

b.    The following information about the customers or subscribers associated with the **Subject Account** for a period of 45 days from the issuance of the warrant, including:

i.      Names (including subscriber names, user names, and screen names);

ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.    Local and long-distance telephone connection records;

iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.      Length of service (including start date) and types of service utilized;

vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile

Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

c.     Prospective information about the location of the cellular phone associated with the **Subject Account** for a period of 45 days (during all times of day and night) from the issuance of the warrant, including:

i.      E-911 Phase II data;

ii.     GPS data to include cell tower sector information;

iii.    Latitude-longitude data;

iv.     Other precise location information, including engineering data to include but not limited to RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

v.      Pen Register / Trap and Trace device with prospective cell site information or data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **Subject Account** during any voice, SMS, and/or data transmission, including but not limited to engineering data which would include RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records.

## II.     Information to Be Seized by the Government

All information described above in Section I that would assist and aid in locating any evidence of violations of **Target Offenses**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T in order to locate the things particularly described in this Warrant.

## ATTACHMENT C

### 18 U.S.C. § 3122 Certification

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subject(s) for violation(s) of the Target Offense(s).

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

2/15/2024
DATE

Nick Coffey
Assistant United States Attorney